[No. B040944. Second Dist., Div. Five. July 27, 1990.]

RALPH ANDREWS PRODUCTIONS, INC., Plaintiff and Appellant,
v.
PARAMOUNT PICTURES CORPORATION, Defendant and
Respondent.

## COUNSEL

Irwin Spiegel Osher for Plaintiff and Appellant.

O'Melveny & Myers, Charles P. Diamond and Richard B. Goetz for Defendant and Respondent.

## OPINION

**ASHBY, J.**—Plaintiff and appellant Ralph Andrews Productions, Inc., a California corporation (RAP), appeals from the entry of judgment upon the granting of a summary judgment motion brought by defendant and respondent Paramount Pictures, a Delaware corporation (Paramount). We reverse.

### FACTS

The basis of this lawsuit is RAP's accusation that when RAP's employee, Gary Bernstein, stole an idea for a television game show and took the idea to Paramount, Paramount produced the show even though Paramount knew or should have discovered Bernstein did not have the rights to the game show. Bernstein is not a party to this appeal. The trial court granted Paramount's summary judgment motion finding that at the time Paramount negotiated with Bernstein for the rights to the show, Paramount had neither actual nor constructive knowledge RAP owned the rights.

 In that RAP is the party who opposed the summary judgment motion, we must liberally construe the facts in the light most favorable to RAP. (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].)

RAP and its president, Ralph Andrews, were established producers of television game shows. From 1980 through 1986 RAP had an exclusive agreement with Columbia Pictures Television (Columbia). The agreement required that all projects developed by RAP first be presented to Columbia. If Columbia was not interested in the project, i.e., if Columbia "passed" on the project, RAP then had the right to take the project elsewhere. RAP's office was on the Columbia lot.

From 1981 to September 1, 1983, Bernstein was employed by RAP as vice-president in charge of development. Bernstein's responsibilities includ-

ed developing new concepts for television shows. RAP developed a game show entitled "Anything For Money." The concept was that people would do anything for money.[1] The concept had been presented to and rejected by Columbia.

During July 1983, the idea was presented through an agent to Twentieth Century Fox (Fox). Bernstein told Andrews that Fox requested a letter confirming Columbia "passed" on the project. In a letter dated July 27, Andrews authorized the agent to negotiate with Fox on behalf of RAP. The letter clearly stated that the show had been rejected by Columbia.

Andrews suggested Bernstein present the idea to Paramount. In July 1983, Bernstein called John Goldhammer, Paramount's vice-president. Goldhammer met and discussed the idea of the game show with Bernstein and Bernstein's partner, Larry Hovis. Goldhammer asked who had the rights to the show. Rather than presenting the idea on behalf of RAP, it appears Bernstein told Goldhammer that he and Hovis owned the rights to the show.[2] Bernstein and Hovis also suggested they had the contract with Columbia when they erroneously told Goldhammer they had previously presented the idea to Columbia, with whom they had a contract, but Columbia had rejected the idea.[3] Additional meetings were held among Bernstein, Hovis, Goldhammer, and an independent producer hired by Goldhammer.

Andrews prepared a letter similar to the one he had previously written for the benefit of Fox. This letter was addressed to Paramount on RAP letterhead. Its purpose was to inform Paramount that RAP owned the concept and was free to sell it because the show had been presented to and rejected by Columbia. Bernstein requested Andrews write this letter, stating Paramount had requested assurance that Columbia no longer had rights to the game show. The letter was to be hand delivered by Bernstein to Para-

---

[1] Some of the samples explaining the show were: For $200 would you kiss an octopus? For $2,000 would you get a tattoo that said "mama's boy"? For $350 would you wear a snake around your neck for an entire meal at Scandia?

[2] In Goldhammer's declaration he states: "During the course of the meeting, I asked Messrs. Bernstein and Hovis if they owned the rights to 'Anything for Money,' and either Mr. Bernstein or Mr. Hovis or both of them told me that they did." By itself Goldhammer's statement that he was told Bernstein and Hovis owned the rights would not necessarily dispel all disputes on this fact. Bernstein's statements on this subject are equivocal. The document describing the concept presented to Goldhammer by Bernstein suggests Goldhammer's statement may be true in that the document indicated it was from "Bernstein/Hovis Productions; Gary Bernstein, Larry Hovis."

[3] Bernstein described this discussion in the following words: "Columbia may restrict our involvement in the project because they were putting us on contract on a full-time basis, and that that might prohibit our involvement in the series."

mount. There was no indication the letter was delivered to Paramount, although copies were disseminated at Columbia. Further, there was no indication that when Goldhammer did not receive the letter he or anyone else at Paramount inquired further.[4]

At Paramount, clearances for shows were normally handled by its legal department. There was no indication such clearances were ever obtained with respect to "Anything for Money." There was no indication anyone from the legal department ever contacted Bernstein or Hovis.

Paramount knew Bernstein at one time was a game show developer and Paramount was aware Bernstein had worked for RAP. A November 1983 news release issued from Paramount verifies that it had this information. In June 1983, Paramount's lawyer directed a letter to Bernstein "c/o Ralph Andrews Productions, Inc., 1050 Columbia Plaza, South, Columbia Pictures." Bernstein was shown to have been affiliated with RAP by the productions credits he received on other game shows.

On October 17, 1983, Paramount formalized its agreement to hire Bernstein, Hovis and another independent producer to produce the pilot. The pilot was produced in 1984, after which time Paramount exercised its option to hire Bernstein and Hovis to produce the syndicated show. One hundred fifty shows (thirty weeks) were produced and broadcast between September 1984 and August 1985. The show was cancelled due to low ratings.

A seven-count complaint was filed on behalf of RAP on September 11, 1984, against Paramount and other parties. Thereafter, the trial court granted Paramount's summary judgment motion finding there were no triable issues of fact. On appeal, the parties implicitly agree the trial court must be reversed if, at the time Paramount contracted with Bernstein, Paramount had knowledge RAP actually owned the concept for the game show or if Paramount was on constructive notice and should have made further inquiry as to the ownership of the concept.

## DISCUSSION

### CONSTRUCTIVE KNOWLEDGE

The standards for examining a summary judgment motion are clear. The proponent has the burden to show there are no triable issues of

---

[4]The only information provided relating to this factual issue was one statement in Goldhammer's declaration. The facts in this statement cannot be considered by us because the court struck the statement as lacking foundation.

fact. (Code Civ. Proc., § 437c, subd. (c).) "Summary judgment is a drastic measure that deprives the losing party of a trial on the merits. [Citation.] It should therefore be used with caution, so that it does not become a substitute for trial. [Citation.] . . . . Any doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. [Citation.]" (*Molko* v. *Holy Spirit Assn., supra*, 46 Cal.3d at p. 1107.) In examining the evidence we are not determining if the evidence is strong or weak, only if sufficient evidence has been presented to raise triable issues of fact. (*Fosgate* v. *Gonzales* (1980) 107 Cal.App.3d 951, 955 [166 Cal.Rptr. 233].)

Constructive knowledge is codified in Civil Code section 19: "Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact."

" 'Where no duty is imposed by law upon a person to make inquiry, and where under the circumstances "a prudent man" would not be put upon inquiry, the mere fact that means of knowledge are open to a [person], and he has not availed himself of them, does not debar him from relief when thereafter he shall make actual discovery. The circumstances must be such that the inquiry becomes a duty, and the failure to make it a negligent omission.' . . . . [Citations.] In many cases it has been said that means of knowledge are equivalent to knowledge. [Citations.] This is true, however, only where there is a duty to inquire, as where [a person] is aware of facts which would make a reasonably prudent person suspicious." (*Hobart* v. *Hobart Estate Co.* (1945) 26 Cal.2d 412, 438 [159 P.2d 958], italics omitted.) "Of necessity, no definite rule can be formulated as to what, in a particular instance, is sufficient to arouse suspicion. But the better rule is that information even as to collateral facts which if pursued would have led to the discovery of the ultimate facts is sufficient to charge the person failing to pursue." (*Barthelmess* v. *Cavalier* (1934) 2 Cal.App.2d 477, 488 [38 P.2d 484].)

 Where the facts are susceptible to opposing inferences whether there was sufficient information to put one on constructive notice, the matter is a question to be determined by a trier of fact. (*Hobart* v. *Hobart Estate Co., supra*, 26 Cal.2d at p. 440; *Baker* v. *Beech Aircraft Corp.* (1974) 39 Cal.App.3d 315, 323 [114 Cal.Rptr. 171, 91 A.L.R.3d 981].) When a competitor hires a former employee of plaintiff who is likely to disclose trade secrets, "[i]t is a question of fact whether the competitor had constructive

notice of the plaintiff's right in the secret . . . ." (2 Callmann, Unfair Competition Trademarks & Monopolies (4th ed. 1982) § 14.35, p. 138.)

 In discussing this concept as applied to a cause of action for unfair competition, it has been explained in the following way: "In any case, when an employee, on his own initiative and in violation of his employer's trust, offers a competitor of his employer information . . . the mere acceptance of such information . . . with knowledge of the facts would make the competitor a party to the breach of trust and subject him to liability for unfair competition. Thus it would be unfair competition for a competitor to accept an employee's disclosure of his employer's trade secrets . . . . And where the offer is such that a breach of contract is patently involved, the competitor is under a duty to inquire. 'Constructive' knowledge is enough to impose liability. It may be that any defendant who honestly inquires may rely upon the result of his inquiry. But it is likely that some objective standards must be met." (2 Callmann, Unfair Competition Trademarks & Monopolies, *supra*, § 9.05, pp. 42-43, fns. omitted.)

The ownership rights of a concept with commercial value is a major concern for all businesses, including the entertainment business. As the facts reflect, clarification of ownership rights is frequently required before potential projects are discussed. As the parties acknowledge, if Paramount had constructive knowledge Bernstein did not have the rights to the concept to the game show, Paramount should have inquired further. General business practices and one's own actions are considered in determining if there is constructive notice. (Epstein, Modern Intellectual Property (2d ed. 1989) p. 72.)

Here, uncertainty as to ownership was a concern. When the concept of "Anything For Money" was discussed with Fox, before further discussions occurred, Andrews drafted a letter verifying RAP was free to take the idea to Fox because Columbia had "passed" on the project. Similarly, when Paramount's employee Goldhammer began to discuss "Anything For Money" with Bernstein, Goldhammer inquired as to who owned the rights and requested a letter verifying Columbia was not interested in the project. Paramount's legal department was responsible for obtaining clearances for such projects.

The record does not reflect, however, that Goldhammer ever received the verification he requested or that Paramount's legal department followed its normal business procedures established to assure the concept was owned by Bernstein. Further inquiry by Paramount was likely to have revealed the

concept was RAP's.[5] While Bernstein may have presented the idea as his and his partner's and Bernstein may have stated Columbia had already "passed" on the idea, such assurances apparently were not sufficient to Goldhammer, who requested this information be verified in writing. The fact that no verification was forthcoming could have given Goldhammer information suggesting ownership of the rights was not as had been portrayed. Having been informed Columbia had potential rights to the idea, Paramount had facts which a jury could determine would have made a reasonable person suspicious. A further inquiry could have lead to the ultimate facts, i.e., RAP's ownership.

In addition, the record contains no explanation of Paramount's usual procedures for obtaining clearances, the standards for providing clearances in the industry, or if such procedures were followed in this case.

In *Barthelmess* v. *Cavalier, supra*, 2 Cal.App.2d 477, plaintiff's unfaithful employee inappropriately pledged plaintiff's holdings as collateral for a speculative stock venture. The court held there were sufficient facts to allow the jury to determine whether the brokerage firm owed a duty to investigate further to determine the true owner of the securities. In so concluding the court stated: "The test of prudence is not subjective; it is objective. It postulates the existence of a criterion, upon the basis of common experience, which calls for action, under certain circumstances, upon the part of prudent persons. We feel that the facts here presented were such as to justify the submission to the jury of the fact whether good faith existed. It is to be borne in mind that we are not dealing with the weight of the evidence." (*Id.* at p. 492.)

Paramount argues it had no duty to inquire because Bernstein's statements constituted a fraud upon which Paramount justifiably relied. In making this argument, Paramount points to the general rule that the doctrine of constructive notice does not apply where one is justified in relying upon a false representation.[6]

---

[5] We disagree with Paramount's statement that an inquiry to Columbia was not likely to reveal the ownership of the concept. RAP was located on the Columbia lot. Had an inquiry been made to Columbia's personnel, a likely response would have been, "Bernstein does not have a contract with Columbia. But, when RAP presented the idea, we passed." The information obtained would have been that which was "naturally and reasonably connected with the fact known." (*West* v. *Great Western Power Co.* (1940) 36 Cal.App.2d 403, 407 [97 P.2d 1014].)

[6] This rule was developed to assure those who were deceitful were held liable for their actions while protecting the negligent from an intentional misrepresentation. (See discussions in *Bagdasarian* v. *Gragnon* (1948) 31 Cal.2d 744, 748-749 [192 P.2d 935]; *Teague* v. *Hall* (1916) 171 Cal. 668, 670-671 [154 P. 851]; *Seeger* v. *Odell* (1941) 18 Cal.2d 409, 414-416 [115 P.2d 977, 136 A.L.R. 1291]; *Watts* v. *Crocker-Citizens National Bank* (1982) 132 Cal.App.3d 516,

In determining reasonable reliance, one's experience and intelligence, along with the business environment are considered. (*Bagdasarian* v. *Gragnon, supra*, 31 Cal.2d at p.748; *Seeger* v. *Odell, supra*, 18 Cal.2d at p. 415; *Feckenscher* v. *Gamble* (1938) 12 Cal.2d 482, 496 [85 P.2d 885].) "Reliance generally is a question of fact." (*City of Salinas* v. *Souza & McCue Construction Co.* (1967) 66 Cal.2d 217, 224 [57 Cal.Rptr. 337, 424 P.2d 921], disapproved on other grounds in *Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1 [84 Cal.Rptr. 173, 465 P.2d 61, 77 A.L.R.3d 398]; *Roland* v. *Hubenka* (1970) 12 Cal.App.3d 215, 225 [90 Cal.Rptr. 490].) Here, the person receiving the alleged deceitful information was not a novice nor unsophisticated in this type of business transaction. Goldhammer held an important position at Paramount, one which by its nature indicated he was knowledgeable in acquiring rights to entertainment products, including concepts. Further, he was explicitly given information which indicated another entity may have had rights to the concept.

Before Paramount successfully argues it was defrauded, it must be shown Paramount justifiably relied on Bernstein's statements (*Wilke* v. *Coinway, Inc.* (1967) 257 Cal.App.2d 126, 136 [64 Cal.Rptr. 845]), a finding we cannot make on the record before us as a matter of law.

Without additional information as to the usual procedures for obtaining clearances, whether such procedures were followed in this case, whether Goldhammer followed up on his request for information, and without more details as to whether Paramount relied on Bernstein's statements, there are triable issues of fact as to whether Paramount was defrauded or Paramount had sufficient facts to excite suspicion such that an inquiry was required. (See *Stevens* v. *Marco* (1956) 147 Cal.App.2d 357, 381-382 [305 P.2d 669].)

CONTINUING USE

Because there are triable issues of fact we need not address whether RAP can collect for a continuing use of the concept. However, because this issue may be raised upon remand, we comment briefly. The Uniform Trade Secrets Act was codified in California in Civil Code section 3426 et seq., effective January 1, 1985. (Added by Stats. 1984, ch. 1724, § 1.) Civil Code section 3426.10 deals with continuing misappropriations. Pursuant to this statute, *damages* for a misappropriation which began prior to January 1, 1985, and continued thereafter are limited to those which occurred after that date. Further, recovery for a continuing misappropriation "does apply

522-523 [183 Cal.Rptr. 304]; Levy et al., Cal. Torts (1990) § 40.06[2][a], [b], pp. 40-32.2–40.33; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 714-716, pp. 812-815.)

to the part of the misappropriation occurring on or after [January 1, 1985] unless the appropriation was not a misappropriation under the law in effect before [January 1, 1985.]" (Civ. Code, § 3426.10.) Because here the alleged misappropriation began prior to January 1, 1985, Paramount's liability for a continuing misappropriation will be based upon the law in effect prior to January 1, 1985. Decisions as to whether Paramount paid value in good faith to acquire the concept and whether Paramount changed its position such that to subject Paramount to liability would be inequitable will determine Paramount's liability under this concept. (Rest., Torts (1939) § 758; *Vantage Point, Inc.* v. *Parker Bros., Inc.* (E.D.N.Y. 1981) 529 F.Supp. 1204 [company showed it followed internal policies and did not have access to plaintiff's idea taken by ex-employee; further, company did not deal directly with ex-employee and once it had notice, company had changed position by investing considerable sums in the project]; see discussions in 2 Callmann, Unfair Competition Trademarks & Monopolies, *supra*, § 14.36, pp. 142-143; Levy et al., Cal. Torts, *supra*, § 40.50, pp. 40-87 et seq.; Sheridan, Attorney's Guide to Trade Secrets (Cont.Ed.Bar Supp. 1990) pp. 129-132.)

The judgment is reversed. Costs on appeal are awarded to appellant.

Lucas, P. J., and Boren, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 10, 1990.