116 F.3d 1485
 1997-1 Trade Cases P 71,782
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
In re The INGLE COMPANY, INC., Debtor.
The INGLE COMPANY, INC., Plaintiff-Appellant,
v.
VIDEOTOURS, INC., a Delaware corporation; Litton
Syndications, Inc., a Maryland Corporation; and
MacFadden Publishing, Inc., a Delaware
Corporation, Defendants-Appellees.
 No. 96-55561.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Sept. 16, 1996.
Decided Jan. 7, 1997.
 
 1
 Appeal from the United States District Court for the Central District of California, D.C. No. CV-93-06484-LGB, Bankruptcy No. AD-93-03863-CA; Lourdes G. Baird, Judge, Presiding.
 
 
 2
 Before: KOZINSKI and LEAVY, Circuit Judges, and SCHWARZER,* Senior District Judge.
 
 
 3
 MEMORANDUJ**
 
 
 4
 This is an unfair competition case concerning an educational wildlife television series, "Zoolife with Jack Hanna" ("Zoolife"), produced by appellant The Ingle Company ("Ingle") and licensed to television stations through defendant Litton Syndications, Inc. ("Litton"). The controversy arises principally out of alleged breaches of a confidentiality agreement executed by defendant VideoTours, Inc. ("VideoTours") in connection with negotiations about a possible investment by VideoTours and its parent, Macfadden Publishing, Inc., in Ingle. In this action, Ingle contends that VideoTours violated the agreement by soliciting and employing Ingle's key production personnel, who took confidential Zoolife materials from Ingle, and by producing "Jack Hanna's Animal Adventures" ("Animal Adventures"), which is substantially similar to Zoolife. Ingle asserted causes of action for fraudulent transfer, turnover of property, violation of section 43(a) of the Lanham Act, unfair competition, breach of contract, breach of confidential relationship, and interference with prospective economic advantage. Ingle also made claims for a constructive trust and an accounting.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 5
 Because the parties are familiar with the facts, we recite only those facts material to our disposition of this appeal. In 1992, Ingle began producing "Zoolife with Jack Hanna," a half-hour television show, which featured Hanna's visiting various zoos and animal parks. Ingle contracted with Litton to syndicate twenty-six original episodes of Zoolife beginning in April 1992. During its first season, the show consistently lost money, and by the end of 1992, Ingle was in arrears. In May 1993, Ingle sought financing from VideoTours. During negotiations, VideoTours entered into an agreement (the "confidentiality agreement") and received from Ingle a private placement prospectus (the "Zoolife Book") and other information. The negotiations ended in June when the parties failed to reach agreement. Meanwhile, Ingle stopped paying Hanna's salary, and in May, Hanna canceled his contract with Ingle for nonpayment. In early July, Ingle terminated its production staff; it filed for reorganization under Chapter 11 on July 20, 1993.
 
 
 6
 Less than a month later, VideoTours hired Hanna to host "Jack Hanna's Animal Adventures," a half-hour television series similar in format and content to Zoolife. VideoTours then hired former Zoolife personnel, in particular Suzanne Bauman ("Bauman"), to produce the series. Production of Animal Adventures began on August 13, and the first six episodes were shot within two weeks. The series began airing nationally on October 2, 1993 and remained on the air at the time briefs were filed.
 
 
 7
 Before and immediately after filing for bankruptcy, Ingle negotiated with the Samuel Goldwyn Company ("Goldwyn") for funds to continue production of Zoolife. Litton, then Zoolife's syndicator, learned that Ingle had promised Goldwyn exclusive domestic distribution rights to Zoolife. Based on its contract with Ingle, Litton sent a cease and desist letter to Goldwyn and Ingle. On July 23, 1993, Ingle petitioned the bankruptcy court to reject the contract between Ingle and Litton, and the court granted the petition on August 9. Following the order, Litton called on the broadcasters with which it had contracted to carry Zoolife to cancel those contracts and to replace Zoolife with Animal Adventures, which was also to be syndicated by Litton. Coincident with the launch of Animal Adventures, Goldwyn lost interest in the Ingle venture. Ingle was unable to find an alternative source of funding and abandoned plans for resuming production of Zoolife.
 
 
 8
 Ingle then filed this action in the bankruptcy court. The district court withdrew the reference to the bankruptcy court and ultimately granted partial summary judgment for defendants on all claims other than the fraudulent transfer, turnover of property, and Lanham Act and state law "passing off" claims. Ingle stipulated to a dismissal with prejudice of the latter claims. The district court then entered final judgment for defendants, and this appeal followed.[1]
 
 
 9
 The district court had jurisdiction of this action under 28 U.S.C. sections 1331, 1332, 1334, and 1367. We have appellate jurisdiction under 28 U.S.C. section 1291. We AFFIRM in part and REVERSE in part.
 
 DISCUSSION
 I. STANDARD OF REVIEW
 
 10
 We review a grant of summary judgment de novo. Reynolds v. County of San Diego, 84 F.3d 1162, 1166 (9th Cir.1996). We determine whether, viewing the evidence in the light most favorable to Ingle, there are any genuine issues of material fact and whether the district court correctly applied the law. Zuill v. Shanahan, 80 F.3d 1366, 1368 (9th Cir.1996). Summary judgment is proper only if there is no issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). We may affirm on any ground supported by the record. Reynolds, 84 F.3d at 1166.
 
 II. CLAIMS AGAINST VIDEOTOURS ALONE
 A. Breach of Contract Claim
 
 11
 Ingle's principal claim is against VideoTours for breach of the confidentiality agreement. The agreement provided that VideoTours would use nonpublic material furnished under the agreement only to evaluate a possible transaction with Ingle and that, for a specified period, VideoTours would not knowingly employ or solicit or induce employment or termination of employment of then-Ingle employees.
 
 
 12
 1. The bar against use of non-public material
 
 
 13
 The district court found that Ingle had failed to present evidence sufficient to raise a triable issue as to whether VideoTours used or misused information it received under the confidentiality agreement. Ingle argues that evidence shows that Zoolife materials were present at VideoTours' offices, that some Animal Adventures episodes dealt with subjects that Zoolife had researched or planned to cover in future episodes, and that VideoTours was inexperienced in the business and could not have had Animal Adventures in production in August and on the air by October had it not used nonpublic information from Ingle. The inference Ingle would have the trier of fact draw is too general and speculative. VideoTours undoubtedly benefited from the experience and knowhow of Jack Hanna and others who had formerly worked for Ingle--as the law permits. It points to no nonpublic information received concurrently with the agreement that VideoTours actually used in the production of Animal Adventures episodes.[2] The district court did not err in rejecting this claim.
 
 
 14
 2. The bar against employing or soliciting former Ingle employees
 
 
 15
 In its briefs to this court, Ingle alleges that VideoTours. breached two aspects of the employment clause of the confidentiality agreement: the ban on employing Ingle employees and the bar against soliciting Ingle employees. The ban on employing former Ingle employees is void because it violates California public policy. Cal. Civ.Code § 16600 (protecting ability to engage in a trade or business); Loral Corp. v. Moves, 219 Cal.Rptr. 836, 844 (Cal.Ct.App.1985); see Metro Traffic Control, Inc. v, Shadow Traffic Network, 27 Cal.Rptr.2d 573, 577 (Cal.Ct.App.1994); Diodes, Inc. v. Franzen, 67 Cal.Rptr. 19, 26 (Cal.Ct.App.1968); see also Dyson Conveyor Maint., Inc. v. Young & Vann Supply Co., 529 So.2d 212 (Ala.1988) (holding that no switch agreement binding employees violated public policy). The nonsolicitation provision, however, is not prohibited by California law.
 
 
 16
 a. Application of section 16600
 
 
 17
 to the nonsolicitation provision
 
 
 18
 There is evidence that VideoTours solicited, and as a result hired, former Ingle employees. If the no-solicitation agreement were enforceable, Ingle raised a triable issue as to its breach. The district court held that it was not enforceable by reason of Cal. Bus. & Prof.Code section 16600 and that it was not saved by the exceptions for acts that amount to unfair competition or the theft of trade secrets.
 
 
 19
 Section 16600 provides, subject to exceptions not applicable here, that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof.Code § 16600. The reported cases have applied this section to restraints on the freedom of individuals to seek and pursue employment. No case has been cited to us and we have found none that has applied this section to an agreement between competitors restricting one from soliciting the employees of the other. But see Dyson Conveyor Maint., Inc., 529 So.2d 212 (holding that Alabama's analog to Cal. Civ.Code § 16600 prohibited no-switching agreement reached by two companies engaged in merger negotiations).
 
 
 20
 In Metro Traffic Control v. Shadow Traffic, 27 Cal.Rptr.2d 573 (Cal.Ct.App.1994), the court said:
 
 
 21
 Section 16600 has specifically been held to invalidate employment contracts which prohibit an employee from working for a competitor when the employment has terminated, unless necessary to protect the employer's trade secrets. The corollary to this proposition is that competitors may solicit another's employees if they do not use unlawful means or engage in acts of unfair competition.
 
 
 22
 Id. at 577 (citations omitted). The question is whether section 16600 precludes a competitor from voluntarily restricting its ability to solicit another's employees. This question has not yet been addressed in any reported decision under California law. The plain language of the statute imposes no such bar. Moreover, it does not follow from the fact that persons may not be otherwise restrained from soliciting competitors' employees that they may not agree to refrain from doing so. Such an agreement does not prevent persons from engaging in their profession, trade or business; it does not even preclude them from going to work for the competitor. See Loral Corp. v. Moves, 219 Cal.Rptr. 836, 844 (Cal.Ct.App.1985).
 
 
 23
 The agreement in this case, moreover, was ancillary to negotiations concerning a possible investment by VideoTours in Ingle and was designed to facilitate disclosure of confidential information by Ingle. It was limited to a period not to exceed two years. We do not believe such an agreement can fairly be regarded as one that restrains anyone's pursuit of a livelihood. Thus, its enforcement is not barred by section 16600.
 
 
 24
 b. Validity under section 16600
 
 
 25
 Even assuming that section 16600 is relevant to the enforceability of this no-solicitation agreement, it is clear that the section does not bar an employer from obtaining relief against solicitation of its employees under appropriate circumstances. Diodes, Inc. v. Franzen, 67 Cal.Rptr. 19 (Cal.Ct.App.1968), held:
 
 
 26
 [I]f either the defecting employee or the competitor uses unfair or deceptive means to effectuate new employment, or either of them is guilty of some concomitant, unconscionable conduct, the injured former employer has a cause of action to recover for the detriment he has thereby suffered.
 
 
 27
 Id. at 26. Thus, the question here is not under what circumstances the courts will enforce restrictive agreements against employees, but rather whether an agreement not to solicit a competitor's employees can be enforced against the promisor to protect the promisee against "concomitant, unconscionable conduct." See Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324, 1337-38 (9th Cir.1980) (misappropriation of trade secrets concomitant with solicitation of employees is actionable).
 
 
 28
 Ingle produced evidence that during July, Bauman, while still employed by Ingle, had frequent conversations with VideoTours personnel. On July 30, 1993, two weeks after her employment had ended, Bauman appeared at the Ingle offices and, between 6:00 and 9:30 p.m., removed two hand-truck loads of files and other materials and copied files from Ingle's computer. When asked by an employee about her activities, she said that she was still employed, that she wanted to get several items that belonged to her, and that she was taking some of the material to safeguard it. She was seen leaving with several boxes in her car. Subsequent discovery and investigation disclosed that she took all of Zoolife's production files as well as research and story files, correspondence, footage releases, contracts, scripts, budgets, and production schedules. During this period, Bauman remained in touch with other then or recent Ingle employees about the possibility of a new production company producing an animal series. In August, Bauman and other Ingle personnel went to work for VideoTours and began production of Animal Adventures. A trier of fact may find that Bauman used "unfair or deceptive means to effectuate [her] new employment." Diodes, 67 Cal.Rptr. at 26.
 
 
 29
 A trier of fact may also find that the materials Bauman took were trade secrets. See Hollingsworth Solderless Terminal Co., 622 F.2d at 1337-38. Trade secrets include "information that: (1) Derives independent economic value ... from not being generally known to the public ... and (2) Is the subject of efforts that are reasonable under the circumstances to maintain, its secrecy." Cal. Civ.Code § 3426.1(d). There is evidence from which it could be found that the materials taken, accumulated over the period when Ingle was in operation, were of value to anyone wishing to produce similar shows. See Courtesy Temporary Service, Inc., v. Camacho, 272 Cal.Rptr. 352, 357-58 (Cal.Ct.App.1990). And the surreptitious manner in which these materials were taken supports an inference that they were not public information and not readily available elsewhere. See Greenly v. Cooper, 143 Cal.Rptr. 514, 521 (Cal.Ct.App.1978). Ingle satisfied its burden of showing that it undertook reasonable efforts to protect the secrecy of its research material by presenting evidence that it limited access to research files to Research Department personnel (of which Bauman was not a member), distributed research files only on a need-to-know basis, segregated computer networks, and created limited access research databases. See Religious Tech. Ctr. v. Netcom On-Line Communications Serv., Inc., 923 F.Supp. 1231, 1253 (N.D.Cal.1995) (describing various methods of maintaining secrecy).
 
 
 30
 Finally, Bauman's conduct may be found to be common law misappropriation, a species of unfair competition. The elements of misappropriation are:
 
 
 31
 (1) the plaintiff has invested substantial time and money in development of its ... "property"; (2) the defendant has appropriated the [property] at little or no cost; and (3) the plaintiff has been injured by the defendant's conduct.
 
 
 32
 Balboa Ins. Co. v. Trans Global Equities, 267 Cal.Rptr. 787, 795 (internal quotations and citation omitted) (Cal.Ct.App.), cert. denied, sub nom. Collateral Protection Ins, Serv. v. Balboa Ins. Co., 498 U.S. 940 (1990). Ingle offered evidence that the information taken by Bauman was costly to assemble and essentially costless to remove. While there is no evidence of injury, it is a reasonable inference that the loss of these materials and its subsequent use by VideoTours could have eviscerated the material's value to any potential buyer of Ingle's assets. See Balboa Ins. Co., 267 Cal.Rptr. at 796.
 
 
 33
 With respect to its claim that VideoTours broke the confidentiality agreement by soliciting Ingle employees, therefore, viewing the facts in a light most favorable to Ingle, as we must, we conclude that under the principle of Diodes, Inc. v. Franzen, 67 Cal.Rptr. 19 (Cal.Ct.App.1968), it has raised material triable issues of fact.
 
 B. Breach of Confidential Relationship
 
 34
 Ingle alleges that it entered into a confidential relationship with VideoTours in reliance on the confidentiality agreement and that VideoTours violated that relationship by soliciting and hiring Ingle's employees and by misappropriating confidential information. The district court correctly held that to the extent this claim covers conduct subject to the confidentiality agreement, Ingle has no claim for breach of a confidential relationship. Tele-Count Eng., Inc. v. Pacific Tel. & Tel., 214 Cal.Rptr. 276, 280-81 (Cal.Ct.App.1985) ("The tort of breach of confidence is based upon the concept of an implied obligation or contract between the parties. It is an 'obligation in law where in fact the parties made no promise. It is not based upon apparent intentions of the involved parties; it is an obligation created by law for reasons of justice.' " (citations omitted)). Any communication of information to VideoTours and any solicitation and hiring of employees was governed by the confidentiality agreement; so long as it remained in effect, the terms of the agreement negotiated by the parties controlled their rights and obligations, and thus, Ingle's remedy is limited to action for breach of the agreement.[3]
 
 III. CLAIMS AGAINST VIDEOTOURS AND LITTON
 A. Trade Dress Infringement
 
 35
 Ingle contends that VideoTours' Animal Adventures infringed the audio and video components of the trade dress of Ingle's Zoolife, in violation of section 43(a) of the Lanham Act. 15 U.S.C. § 1125(a)(1)(A). It argues that Zoolife had a format and appearance that set it apart from other wildlife television programs, consisting of the opening montage, of the host's interacting with animals and human participants, of a wildlife conservation message, and of the endorsement logo of the National Education Association. The district court held that Ingle failed to sustain its burden of coming forward with evidence sufficient to permit a trier of fact to find that these features are not functional. See Rachel v. Banana Republic, Inc., 831 F.2d 1503, 1506 (9th Cir.1987) (burden of proving nonfunctionality on plaintiff).
 
 
 36
 To support its claim, Ingle must show that the appearance of Zoolife "(1) is nonfunctional; (2) is either inherently distinctive or has acquired secondary meaning; and (3) is likely to be confused with [VideoTours'] products by members of the public." International Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 823 (9th Cir.1993). We are not aware of decisions, and the parties have cited none, applying trade dress protection to television programs. While it may be appropriate to extend that protection to programs, decisions involving physical objects do not readily translate to electronic media.
 
 
 37
 Ingle first alleges that the opening montage of Animal Adventures mimics that of Zoolife. An opening montage that introduces and summarizes the subject matter of the program is an essential feature. While the openings of both Animal Adventures and Zoolife include a percussive soundtrack and footage of animals and Jack Hanna, the former cannot be said to mimic the latter. Zoolife's opening is dominated by the mantra "Wildlife. Zoolife." and by the emergence of each animal scenes out of an expanding black circle in the middle of the previous image. Animal Adventures' animal scenes are superimposed over the outlines of maps, and the accompanying refrain extols the virtues of "[t]he magic and thrill of adventure. The animal world of adventure." In short, these openings (and indeed the two shows) are no more similar than any two shows organized around the same principles (e.g., "ER" and "Chicago Hope," "Real People" and "That's Incredible," or "Entertainment Tonight" and "Extra").
 
 
 38
 Ingle also argues that the timing of the segments and the placement of a sponsor's conservation segment violate Zoolife's trade dress. Nothing in the record suggests, however, that segment timing or placement of a sponsor's blurb is not functional (it may be convenient for broadcasters or consistent with children's attention span), is distinct (it may comport with industry standards), or is liable to confuse a member of the public (viewers seem unlikely to identify programs on the basis of segment length or of sponsors' slots).
 
 
 39
 As to Ingle's contention that Animal Adventures' content is indistinguishable from Zoolife's, a high degree of similarity is inevitable since Hanna is the star of both shows and both feature his discussions with zookeepers, animal trainers, and animal researchers. But Hanna and his encounters with caged beasts and their handlers are functional because they are the premise of the show. See Rachel v. Banana Republic, Inc., 831 F.2d at 1506 (holding that "[a] product feature is functional if it is essential to the product's use"). Ingle cannot claim a monopoly on the idea of having Hanna interact with animals and their keepers. Indeed, the very essence of trade dress is that it protects the effort a manufacturer has invested in the appearance of a commodity--not the idea behind it.
 
 
 40
 Similarly, the National Education Association's ("NEA") logo that appears in both shows is functional. The logo denotes the NEA's approval of the program, and the NEA's endorsement encourages broadcasters to carry the show in fulfillment of their obligation to air children's educational television and assures parents that the content of the show is educational.
 
 
 41
 Nor does the sum of all these elements amount to trade dress infringement. The shows' opening montages distinguish them; the similarity of their content after the openings goes to the premise of the show rather than to its appearance. After their openings, these shows are similar because their subject and purpose are nearly indistinguishable--not because Animal Adventures copied a unique format identifiable as Zoolife's. If there is confusion, it is because both shows are about wildlife and are built around Jack Hanna.
 
 B. Unfair Competition
 1. VideoTours
 
 42
 Ingle contends that VideoTours' conduct constituted common law misappropriation and violated Cal. Civ.Code section 17200. Ingle cites no case applying section 17200 to a simple breach of contract, and we have found none. As to the common law claim, Ingle alleges that the taking and use of Zoolife plans, research and production materials and confidential information resulted in injury. But it has come forward with no evidence that VideoTours made improper use of material it received from Ingle. That Bauman may have been guilty of improper conduct in removing material from Ingle before becoming VideoTours' employee is not sufficient to impose liability on VideoTours. See Ralph Andrews Productions, Inc. v. Paramount Pictures Corporation, 271 Cal.Rptr. 797, 800 (Cal.Ct.App.1990) (liability depends on acceptance of information with knowledge of employee's misappropriation).
 
 2. Litton
 
 43
 Ingle contends that Litton acted beyond its authority as agent for Ingle and interfered wrongfully when it contacted television stations to have them substitute Animal Adventures for Zoolife. Litton made those contacts after the bankruptcy court, at Ingle's request, rejected Ingle's syndication contract. Rejection of the contract amounted to a breach, 11 U.S.C. § 365(g), exposed Litton to liability to the broadcasters, and caused Litton to lose its syndication fees. Litton therefore was bound "to do everything reasonably proper to mitigate damages." Service v. Trombetta, 28 Cal.Rptr. 68, 73 (Cal.Ct.App.1963); see Davies v. Krasna, 535 P.2d 1161, 1169-70 (Cal.1975); Guerrieri v. Severini, 330 P.2d 635, 641 (Cal.1958). Litton's efforts to secure substitute programming enabled it to satisfy its contractual obligations to television stations. Furthermore, Litton's conduct was reasonable because, contrary to Ingle's contentions, it did not interfere with existing Ingle contracts. Ingle had already implicitly repudiated its contracts with the broadcasters: Hanna's cancellation of his contract, Ingle's failure to secure financing, and Zoolife's lack of a production staff just weeks before new episodes were due to broadcasters "put[ ] it out of [Ingle's] power to perform so as to make substantial performance of [its] promise impossible." Taylor v. Johnston, 539 P.2d 425, 430 (Cal.1975). Thus, Ingle's implicit repudiation of its obligation to the broadcasters means that no underlying contract existed with which Ingle could have interfered. Litton's provision to the television stations of an acceptable alternative to Zoolife was a reasonable means to mitigate its potential damages.
 
 
 44
 D. Interference with Prospective Economic Advantage Claim
 
 
 45
 "The crux of Ingle's claim for interference with prospective business advantage," as its brief puts it, was that by launching Animal Adventures and canceling television stations' agreements to broadcast Zoolife, defendants prevented Ingle from obtaining financing from Goldwyn to continue the Zoolife series and thereby also interfered with prospective advertising and home video arrangements.
 
 
 46
 There is no evidence from which a trier of fact could find that Goldwyn was about to invest in Ingle, much less that defendants interfered with the Goldwyn negotiations. To the extent that the appearance of Animal Adventures undermined a deal with Goldwyn, Ingle complains simply of legitimate competition.
 
 
 47
 To support its claim, Ingle must "prove ... that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of the interference itself." Della Penna v. Toyota Motor Sales, U.S.A., Inc., 902 P.2d 740, 751 (Cal.1995). However, "a competitor is free to divert business to himself as long as he uses fair and reasonable means.... [T]he competition privilege is defeated only where the defendant engages in unlawful or illegitimate means." PMC, Inc. v. Saban Enter., Inc., 52 Cal.Rptr.2d 877, 891 (Cal.Ct.App.1996) (citations omitted). There is no evidence of such conduct by defendants; the injury Ingle complains of was suffered as a consequence of competition.
 
 
 48
 We have considered Ingle's other contentions and find them to be without merit.
 
 SUMMARY AND CONCLUSION
 
 49
 For the foregoing reasons, we REVERSE the judgment for defendant VideoTours on Ingle's claim of breach of the no-solicitation agreement and REMAND for further proceedings consistent with this opinion. In all other respects the judgment is AFFIRMED. No costs to the parties.
 
 
 
 *
 Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 Although Ingle's Notice of Appeal states that the appeal is taken from the judgment and all orders preceding it, including the summary judgment order, Ingle's brief does not address its constructive trust and accounting claims. We therefore deem those claims waived. In re Worlds of Wonder Sec. Lit., 35 F.3d 1407, 1423 (9th Cir.1994) ("The Court of Appeals will not ordinarily consider matters on appeal that are not specifically and distinctly argued in the appellant's opening brief." (citation and internal quotation marks omitted)), cert. denied, sub nom. Miller v. Pezzani, 116 S.Ct. 185 (1995)
 
 
 [2]
 Ingle refers to evidence that VideoTours computed its projected Animal Adventures budget by multiplying Zoolife budget figures (provided to VideoTours in confidence) by the projected number of Animal Adventures episodes. Assuming Ingle's allegation to be true, it fails to state any consequent injury and therefore was properly rejected by the district court
 
 
 [3]
 Igle alleges that confidential information communicated by its former employees to VideoTours caused VideoTours to commit a breach of the confidential relationship. Even assuming that the information was communicated to VideoTours and that it was not subject to the confidentiality agreement, Ingle fails to show that VideoTours received it knowingly. See Ralph Andrews Productions, Inc. v. Paramount Pictures Corp., 271 Cal.Rptr. 797, 800 (Cal.Ct.App.1990) (requiring that corporation receiving information know of its confidentiality to have breached the relationship)