[No. B203174. Second Dist., Div. Eight. Feb. 11, 2009.]

KENNETH CLEVELAND et al., Plaintiffs and Appellants, v. INTERNET SPECIALTIES WEST, INC., et al., Defendants and Respondents.

## Counsel

Hinshaw & Culbertson, Filomena E. Meyer and Desmond J. Hinds for Plaintiffs and Appellants.

Neufeld Law Group, Timothy L. Neufeld, John M. Kennedy; Greines, Martin, Stein & Richland and Robin Meadow for Defendants and Respondents.

## Opinion

**O'NEILL, J.***—

### SUMMARY

Kenneth Cleveland and William Bickley sued several defendants in December 2005, asserting claims of breach of contract and fraud, among others, in connection with a $75,000 investment made pursuant to the terms of a February 1995 agreement. Defendants sought summary judgment on statute of limitations grounds, asserting, among other things, that under the discovery rule for accrual of causes of action, the statutes of limitations began to run in 1996 or 1997, because plaintiffs were then on notice of their injury. The trial court agreed, finding all statutes of limitations began to run by mid-1996, at the latest. We conclude the trial court erred in granting summary judgment, as the question whether and when a reasonably prudent person would have suspected his injury and some wrongful cause was for the trier of fact to decide.

*Judge of the Ventura Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## FACTUAL AND PROCEDURAL BACKGROUND

From 1993 to October 1995, Kenneth Cleveland was the accountant for Interactive Strategies, Inc. (ISI), a company that provided technical equipment and facilitated services in the adult telephone entertainment industry. ISI's officers and shareholders were Robert Johnson, J. Edward Hastings and Brian Spitler. Early in 1995, one of ISI's officers told Cleveland that ISI was starting a new stand-alone division of ISI known as The Central Connection, in which Cleveland might be interested in investing. The Central Connection business was to operate as an Internet service provider offering dial-up Internet connections to its customers. Cleveland and a friend, William Bickley (collectively, Cleveland), agreed to invest $75,000 in the project. Cleveland drafted a memorandum to ISI summarizing the agreement between ISI and Cleveland, which both parties signed, and the $75,000 was provided to ISI on February 9, 1995. The terms of the agreement between ISI and Cleveland were:

—Cleveland would provide $75,000 of capital "to be used by [ISI] to develop and implement a program to allow access to the InterNet information network."

—All expenditures of the capital provided were to be at ISI's sole discretion, so long as they were related to the Internet project.

—Net cash receipts of the project were defined as gross receipts from the sale of Internet software packages or Internet access fees, "less all applicable expenses directly related to the Internet project."

—Cleveland was to receive 100 percent of the net cash receipts from the Internet project "until all capital invested by [Cleveland] has been recouped. At that time [Cleveland] shall be paid 5% of gross receipts from the InterNet project."

ISI recorded The Central Connection as a fictitious business name on February 17, 1995. Cleveland's understanding was that The Central Connection division would become a separate corporation.

In June or July 1995, Johnson asked Cleveland to cover losses being incurred by The Central Connection, which needed more capital, but Cleveland said he wasn't going to do so until he received some more information.

In July 1995, Cleveland received a copy of a resignation letter from Kristina Nolan, an ISI employee with a "series of grievances," the final of which was a critical performance report. Nolan had been employed for five

months, and was working on The Central Connection project. In the course of her two-page resignation letter, she complained about, among other things, "a lack of objectives and deadlines for the Central Connection project," and the fact that critiques of her work "should not have come for the first time as a response to the heightened financial crisis of the project as specifically caused by the project's investor, Kenny Cleveland, pulling out his funds . . . ." (The latter did not happen.) Nolan stated she resigned because she "[did] not wish to work for a company whose administration neglects projects to the point of financial disaster . . . ."

In September 1995, Cleveland met with Hastings, who subsequently wrote a memo to Cleveland dated September 18, 1995, with an update on The Central Connection. Hastings enclosed a profit and loss statement for The Central Connection showing revenues of $4,500 per month against operational costs of $10,000 per month, and a summary report showing expenses through August 1995 of $43,000 (exclusive of rent and utilities); Hastings observed that this would continue for several months and the overall expenses would exceed $75,000. Hastings also indicated that repayment of Cleveland's investment "can only come from the Central Connection." After a fax from Cleveland, Hastings sent a memo to Cleveland on September 19, 1995, with a new report reflecting total income and expenses for the period March 1, 1995, through September 15, 1995, showing income of approximately $15,000 and expenses of over $45,000.

In October 1995, Cleveland's services as ISI's accountant were terminated.

In 1995 and into 1996, Cleveland called all three of the officers of ISI (but mostly Hastings), asking for financial information. At some point in 1996, Cleveland testified, "they retained an attorney and told me to talk to their attorney." On October 2, 1996, Cleveland received a letter from ISI's attorney, Richard Marks, about Cleveland's "numerous requests that [ISI] voluntarily provide you with an accounting regarding the expenses incurred by [ISI]." Marks enclosed an "Account QuickReport" showing expenses and disbursements from February through April 1995. Since the information was "over a year old," Cleveland called Marks and said he needed more information, and Marks said he would talk to his clients. Cleveland called Marks several times, and Marks kept telling Cleveland he would get him the information. Cleveland testified that he thought Marks "got tired of me calling, and so he told me that I needed to, you know, hire an attorney to call him again. And I didn't understand that, you know, because I just needed the information. And so, you know, I just thought I'd wait for the information." Cleveland characterized the financial information he received as, "while incomplete, depict[ing] a company that was earning revenues but was not profitable and struggling to survive." According to Johnson, The Central Connection operated for about a year and then went out of business.

After the end of 1996, Cleveland made no further efforts to get financial information on The Central Connection business.

In September 1998, Jerry Smith, ISI's lawyer, told Cleveland that The Central Connection did not survive and had gone out of business. In reliance on Smith's representation and information that Hastings had moved to Palm Springs, Cleveland decided that "further requests for an accounting to confirm that [Cleveland's] capital investment was being applied to expenditures related to The Central Connection was futile." About a year later, in 1999 or 2000, Cleveland ran into Johnson in Westlake Village, and inquired about The Central Connection. Johnson told him it had gone out of business and Cleveland's investment was lost. Cleveland asked him for some verification, so that he could document the loss of his investment in case he needed to do so for tax purposes. Johnson said he would send him something, but never did so.

Some five or six years later, in May 2005, Cleveland was in the market for an Internet service provider for his company, and received a referral to a company called Internet Specialties West, Inc. (IS West). He visited IS West's offices and, while waiting and perusing a brochure, saw a picture of Johnson, who was described as the president of IS West. The brochure described IS West's business, which was similar to The Central Connection business, and stated it had been founded in 1996. Cleveland's suspicions were aroused. He returned to his office, accessed IS West's Web page, and discovered the statement that IS West was "[e]stablished in 1995 as Central Connections" and that IS West incorporated in 1996 as a California corporation to be a high-speed Internet service provider in Los Angeles and Ventura Counties. Upon investigation, and in the course of this lawsuit, the following facts came to light:

—IS West was incorporated on June 19, 1996, with Johnson, Hastings and Spitler as founding shareholders, along with Ed Rubottom. According to Johnson, IS West did not actually start any operations until 1997; by the year 2000, IS West had almost $100,000 in net revenue accrued over the prior four years, and now generates millions of dollars per year in revenue. IS West operated from the same location as The Central Connection and ISI.

—Meanwhile, in July 1995 and January 1996, a company providing factoring services to ISI (900 Capital Services) filed lawsuits against ISI in Nevada and California, and Michael Freedman, an ISI minority shareholder, filed a derivative suit against ISI and others in October 1997.

—In a declaration filed November 3, 1997, in the Freedman derivative suit, Johnson stated that: "IS West was initially a part of ISI called The Central

Connection. The Central Connection developed and maintained web page sites, dial-up and high speed connection to the internet for its clients. When the business of Central Connection developed, it consisted entirely of non-adult, community and more conservative businesses . . . . There developed a tremendous concern . . . that if the clients of Central Connection learned of the adult nature of ISI it would cause the loss of clients (the majority of ISI's clients are adult in nature). Therefore, the Directors agreed that it was necessary to form a separate corporation to handle the work of Central Connection, and IS West was formed."

—Following the lengthy lawsuits with 900 Capital Services, ISI was unable to get the credit necessary to fund its operations, and went out of business in December 1997. A petition for Chapter 7 bankruptcy was filed as to ISI on January 8, 1998. (Cleveland did not know about the bankruptcy prior to this lawsuit, was never listed as a creditor of ISI, and received no notice of the bankruptcy from ISI, the bankruptcy court, Johnson, Hastings or Spitler.)

Cleveland filed this lawsuit against ISI, IS West, and Johnson (collectively, IS West) in December 2005, six months after his discovery of the information about IS West. Cleveland alleged causes of action for breach of contract, fraud, breach of fiduciary duty and others, asserting a design and scheme "to hijack the internet service provider business enterprise then known as Central Connection, for their own use and profit without the burden of the obligations owed to [Cleveland]." Cleveland sought damages, an accounting, and an order requiring IS West to convey to Cleveland $75,000, 5 percent of IS West's gross receipts for the last 10 years, and 5 percent of all future gross receipts of IS West.

IS West filed a motion for summary judgment on the ground that all Cleveland's claims were barred by the applicable statutes of limitations. The trial court agreed, rejecting Cleveland's claim he had no reason to suspect The Central Connection had been recast as IS West, and that his investment was still viable, until May 2005. The trial court found that all statutes of limitations periods began to run in mid-1996: "[Cleveland] had knowledge of facts by mid-1996, at the latest, sufficient to put a reasonably prudent person on inquiry of their potential claims, including without limitation fraud and breach of contract . . . ." Judgment was entered and this timely appeal followed.

## DISCUSSION

We conclude the trial court intruded on the province of the trier of fact when it concluded, as a matter of law, that Cleveland, "by mid-1996, at the

latest," had knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud or other wrongdoing. We summarize the relevant legal principles and then turn to their application in this case.

■ "[T]he uniform California rule is that a limitations period dependent on discovery of the cause of action begins to run no later than the time the plaintiff learns, or should have learned, the *facts* essential to his claim." (*Gutierrez v. Mofid* (1985) 39 Cal.3d 892, 897 [218 Cal.Rptr. 313, 705 P.2d 886].) Thus, for example, the statute of limitations in a cause of action for fraud "commences to run after one has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry . . . ." (*Bedolla v. Logan & Frazer* (1975) 52 Cal.App.3d 118, 130 [125 Cal.Rptr. 59] (*Bedolla*); see *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 803 [27 Cal.Rptr.3d 661, 110 P.3d 914] (*Fox*) ["under the delayed discovery rule, a cause of action accrues and the statute of limitations begins to run when the plaintiff has reason to suspect an injury and some wrongful cause . . ."].) "Resolution of the statute of limitations issue is normally a question of fact." (*Fox*, at p. 810.) It is plaintiff's burden to show he was not negligent in failing to discover his injury sooner, and whether he exercised reasonable diligence " ' "is a question of fact for the court or jury to decide." [Citation.]' [Citation.]" (*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 833 [195 Cal.Rptr. 421] (*April Enterprises*) [applying discovery rule to a breach of contract cause of action]; see also *Ralph Andrews Productions, Inc. v. Paramount Pictures Corp.* (1990) 222 Cal.App.3d 676, 682 [271 Cal.Rptr. 797] ["[w]here the facts are susceptible to opposing inferences whether there was sufficient information to put one on constructive notice, the matter is a question to be determined by a trier of fact"], citing *Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412, 440 [159 P.2d 958].)

In this summary judgment case, the issue is whether the *only* reasonable inference to be drawn from those facts that are undisputed is that Cleveland should have learned the facts essential to his claims by mid-1996 (or by some later date outside the limitations periods). We answer this question in the negative.

■ We begin with the fact that, entirely aside from the discovery rule, none of Cleveland's causes of action—whether for fraud, breach of contract, or anything else—could have accrued "by mid-1996, at the latest," because Cleveland had suffered no injury at that point. IS West did not even start doing business until 1997, and could not have owed Cleveland any return on his investment until it actually had "net cash receipts" as defined in the parties' agreement. Yet the trial court concluded—based on (1) ISI's failure to provide a full accounting of expenditures on The Central Connection project in 1995 and 1996, (2) a disgruntled employee's letter stating that ISI

"neglect[ed] projects to the point of financial disaster," and (3) a remark by ISI's lawyer (whom Cleveland described as "[s]eeming frustrated by my requests for accounting information") that Cleveland should "hire an attorney to contact him from that point on"—that "all statutes of limitation periods commenced to run in mid-1996 at the latest." That simply cannot be the case; the discovery rule may extend the statute of limitations, but it cannot decrease it, and a statute of limitations does not accrue until a cause of action is "complete with all of its elements," including injury. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397 [87 Cal.Rptr.2d 453, 981 P.2d 79].)

Second, it may be that the trial court equated Cleveland's injury with the loss of the funds he invested, and of course Cleveland *did* have reason to believe his investment was lost by mid-1996, or certainly by 1998, when ISI's lawyer told him The Central Connection had gone out of business. But the loss of an investment is not necessarily a legal injury, as many investors have good reason to know. An injury requires a wrongful cause for the loss, and Cleveland was not wronged until (according to Johnson's declaration) the year 2000, when IS West had accrued some $100,000 in net revenue (and therefore had "net cash receipts" it did not pay to Cleveland). But the trial court, in concluding the statutes began to run in mid-1996, was in effect saying that Cleveland was on notice that ISI *intended to* breach the contract and defraud him in mid-1996, and therefore had a duty to monitor their subsequent activities (including lawsuits filed against ISI and the incorporation of IS West). This is not the law. Indeed, if Cleveland had sued ISI in mid-1996, or investigated the possibility of suit in mid-1996, he would have found nothing. (The only thing that happened in mid-1996 was the incorporation of IS West, which did not begin doing business until the following year.)

IS West argues that in any event Cleveland's claims accrued in 2000, at which time IS West had generated sufficient revenue to pay Cleveland but did not do so.[1] But that is not what the trial court found; the trial court found as a matter of law that "all statutes of limitation periods expired by, at the latest, the end of the year 2000." Moreover, IS West's assertion highlights the critical point in this case. While Cleveland's causes of action could not have accrued until ISI actually breached the agreement or actually defrauded Cleveland, when would a prudent person have suspected that his investment was lost due to a wrongful cause, rather than the ordinary vagaries of information-age businesses? Would a reasonably prudent person have suspected, under the circumstances extant in mid-1996, that ISI intended to

---

[1] IS West asserts Cleveland's causes of action "were also complete by 1998 when ISI attorney Jerry Smith told [Cleveland] that The Central Connection was defunct." As noted in the text, the fact that The Central Connection was insolvent or defunct (and Cleveland's investment therefore lost) does not mean that the investment loss was due to "some wrongful cause," as is required for a cognizable legal injury. (See *Fox, supra*, 35 Cal.4th at p. 803.)

breach the agreement and defraud Cleveland, thus requiring Cleveland to monitor ISI's activities? (Had he monitored the documents filed in lawsuits filed against ISI, he would have found Johnson's declaration of November 3, 1997, stating IS West had been formed "to handle the work of Central Connection . . . .")

■ All these are, it seems to us, quintessential questions for the trier of fact. *Sime v. Malouf* (1949) 95 Cal.App.2d 82 [212 P.2d 946], in which the defendants claimed the plaintiff had notice of facts sufficient to put a prudent man upon inquiry with respect to his fraud claim, is instructive. The Court of Appeal rejected the defendants' statute of limitations defense, observing that "[t]his question, of course, was one of fact for the trial court." (*Id.* at p. 104.) Further: " ' "Circumstances that are dubious or equivocal are not sufficient to take the place of actual notice. . . . The rule imputes notice only of those facts that are naturally and reasonably connected with the fact known, and of which the known fact or facts can be said to furnish a clue. It does not impute notice of every conceivable fact and circumstance however remote which might come to light by exhausting all possible means of knowledge." ' [Citations.] The circumstances must be such that further inquiry is not merely suggested, but becomes an imperative duty, and failure to make it constitutes a negligent omission. [Citations.] The decision on the issue of notice was one of fact." (*Sime v. Malouf, supra,* 95 Cal.App.2d at pp. 106–107.)

■ Summary judgment is not appropriate unless only one reasonable inference can be drawn from undisputed facts. In this case, we certainly cannot say that the only reasonable inference to be drawn is that Cleveland had "knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud" or other wrongdoing in mid-1996, or at any other time prior to his actual discovery of the facts in 2005. (*Bedolla, supra,* 52 Cal.App.3d at p. 130.) As we have seen, Cleveland had no causes of action in mid-1996, when, according to IS West, the "specific facts that imposed upon [Cleveland] a duty of investigation" had already occurred, because he had then suffered no injury from any wrongful cause. By 2000 (according to Johnson), the elements of Cleveland's causes of action were complete. But would a prudent person have suspected a wrongful cause, given statements by ISI lawyer Jerry Smith in 1998 and by Johnson in 2000 that The Central Connection was defunct? As *April Enterprises* and other cases tell us, it is Cleveland's burden to show he was not negligent in failing to discover his injury sooner, but whether he exercised reasonable diligence " ' "is a question of fact for the court or jury to decide." [Citation.]' [Citation.]" (*April Enterprises, supra,* 147 Cal.App.3d at p. 833.) Accordingly, summary judgment was improper.

## DISPOSITION

The judgment is reversed and the cause is remanded to the trial court with directions to vacate its order granting IS West's motion for summary judgment and to enter a new order denying the motion. Appellants are to recover their costs on appeal.

Rubin, Acting P. J., and Flier, J., concurred.