Filed 9/16/15  Cabot Ashtabula 22 v. Jones Lang LaSalle Americas CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| CABOT ASHTABULA 22, LLC et al., | |
| Plaintiffs and Appellants, | G050627 |
| v. | (Super. Ct. No. 30-2012-00593608) |
| JONES LANG LASALLE AMERICAS, INC., et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Gail A. Andler, Judge.  Affirmed.  Request for judicial notice is granted in part.

Catanzarite Law Corporation, Kenneth J. Catanzarite and Eric V. Anderton for Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, Kevin S. Rosen, James L. Zelenay, Jr., and Bradley J. Hamburger for Defendant and Respondent Baker & McKenzie.

Morgan, Lewis & Bockius, Robert E. Gooding, Jr., and Todd W. Smith for Defendant and Respondent Jones Lang LaSalle Americas, Inc.

Pfeiffer Fitzgibbon & Ziontz, Thomas N. Fitzgibbon and Kendra E. Leghart for Defendants and Respondents Clay H. Womak and Markel D. Petty.

\* \* \*

Plaintiffs, on behalf of themselves and a putative class of similarly situated investors, sued a group of defendants alleging they fraudulently induced plaintiffs into purchasing ownership shares in a shopping mall located in Ashtabula, Ohio.  Specifically, plaintiffs allege defendants made intentionally misleading statements that:  (1) Dillard's department store was committed to a long-term lease with the mall, even though defendant knew Dillard's immediate plan was to "go dark" and cease using the leased space; and (2) the upfront cost of the investment (i.e., the "sales load") was 11 percent, when the real cost was more than 30 percent – an amount defendants knew exceeded the entire value of the tax benefits plaintiffs hoped to realize from investing.  The plaintiffs purchased their investment shares between August 2007 and February 2008 and filed their initial complaint nearly five years later, in August 2012.  After a series of demurrers, the trial court sustained defendants' demurrers to the second amended complaint, without leave to amend.  The court sustained the demurrers on several grounds, including that all claims alleged were barred by the applicable statutes of limitations.

Plaintiffs argue the court's ruling was incorrect because they alleged sufficient facts to support application of the delayed discovery rule to their claims. Specifically, plaintiffs argue (1) they did not suffer, and alternatively were not on notice of, any "injury" flowing from defendants' misrepresentation about the Dillard's tenancy as long as Dillard's continued to pay rent to the mall and the mall continued to provide the cash flow payments promised in connection with plaintiffs' investment; and (2) they were not on notice of the true "sales load" associated with their investment until one of

2

the named plaintiffs consulted with plaintiffs' own counsel regarding an unrelated tax issue.

We affirm. The gist of plaintiffs' complaint is that defendants wrongfully induced them into investing in the shopping mall by giving them incorrect, incomplete or misleading information about the investment. They relied to their detriment on defendants' misrepresentations about the mall investment, by purchasing shares they would not have chosen to purchase had they known the true state of facts. Thus, plaintiffs' actionable injury was the purchase of the mall shares, and any causes of action arising out of defendants' alleged misrepresentations accrued immediately upon purchase. Moreover, plaintiffs were sufficiently on notice of the alleged Dillard's misrepresentation because the closure of the Dillard's store at the Ashtabula mall was publicly available information, and defendants allege no facts demonstrating that a reasonably diligent investor would not have learned of it. Plaintiffs' obligation to act diligently was not fulfilled by simply accepting "[d]efendants' ongoing representations that the [mall's] financial difficulties stemmed from the failing economy."

And with respect to defendants' alleged misrepresentation about the size of the sales load associated with their investment, plaintiffs concede they sustained injury at the moment they purchased their shares. However, they allege they did not discover that injury until a communication *with their own counsel* in August 2012. This amounts to a concession that plaintiffs had the information necessary to reveal their cause of action within their own possession and control, and belies their assertion they were unable to discover the injury sooner because defendants "control[led] dissemination of information."

The request for judicial notice filed by respondent Baker & McKenzie is granted to the extent of the private placement memorandum, but otherwise denied.

3

Plaintiffs in this action are Cabot Ashtabula 22, LLC, acting on behalf of itself and other similarly situated "special purpose entities" which were formed to own shares in the Ashtabula mall, and Randall B. Lynch, acting in his capacity as trustee of the Lynch Family Trust, who owns "all of the membership interests of" Cabot Ashtabula 22. Among the named defendants are respondents in this appeal: (1) Jones Lang LaSalle Americas, Inc. (erroneously sued as "Jones Lang LaSalle"), which is identified as "a consultant or advisor" that "solicited and agreed to represent Plaintiffs' interest in the [mall] as property manager to the Plaintiffs via the Master Lease"; (2) Clay H. Womack and Markel D. Petty, who are identified as executives of Direct Capital Securities, Inc., the securities broker-dealer that sold the investment shares to plaintiffs; and (3) Baker & McKenzie, LLP, the law firm that prepared the "tax opinion related to the Offering itself." Each of these defendants demurred to plaintiffs' complaint, and ultimately the trial court sustained their demurrers to plaintiffs' second amended complaint, without leave to amend.

Although the second amended complaint contains 14 causes of action which apply in various combinations to different defendants, plaintiffs acknowledge that all causes of action arise out of the defendants' alleged "material concealment, misrepresentation and omission" designed to induce plaintiffs to invest funds toward the purchase of the Ashtabula Mall. According to the complaint, the putative class of plaintiffs invested a combined $15.1 million toward the overall $44 million acquisition price of the shopping mall. In exchange for their funds, plaintiffs would receive "tenant-in-common" shares in the mall. Plaintiffs allege these shares were specifically marketed to potential investors looking to defer otherwise taxable long-term capital gains through the purchase of "like-kind" real property under 26 United States Code section 1031

(section 1031). Plaintiffs' purchase of the shares took place between August 2007 and February 2008.

Among the documents that plaintiffs were allegedly required to sign as part of their investment in the mall was a "master lease" which provided plaintiffs would be paid an "'absolute net' return" equivalent to 8 percent of their combined $15.1 million investment in the first year, and increasing thereafter during a 20-year lease term. However, although defendants initially made those payments as promised, they subsequently made "lesser distributions [beginning in October, 2010], then suspended distributions [until] the [mall] was lost to foreclosure." Plaintiffs allege they "reasonably believed [defendants'] ongoing representations that the [mall's] financial difficulties stemmed from the failing economy, thus evading suspicion." Consequently, it was not until August 2012, when the mall's foreclosure was "imminent," that plaintiffs allegedly had reason to commence an investigation into the truth of statements made by defendants in connection with their purchase of the shares.

According to the second amended complaint, defendants allegedly made two separate materially misleading statements as a means of inducing plaintiffs' ill-fated purchase of ownership shares in the mall. First, plaintiffs allege defendants misleadingly touted the high percentage of occupied space in the mall as evidence of its financial success, including a specification that Dillard's, one of the mall's five "major tenants," had a lease term extending into 2014, with an option to extend its tenancy for an additional five years. These major tenants were identified as "key traffic generators in the mall." Of those five major tenants, Dillard's was identified as having the longest remaining lease term.

However, unbeknownst to the plaintiff investors, by the time they purchased their shares, defendants were allegedly aware that Dillard's had made the decision to "go dark, i.e., vacate the property but continue making lease payments." And although plaintiffs acknowledge Dillard's plan to "go dark" did not affect its obligation to

5

continue paying rent throughout the initial term of its lease, they allege its decision to do so was nonetheless a material fact that was required to be disclosed to potential mall investors because Dillard's was an "active traffic driver" for the mall. Thus, as plaintiffs allege, the closure of Dillard's "would both indirectly and directly impact the remaining tenants and make the [mall] less attractive to prospective tenants."

Second, plaintiffs allege defendants engaged in fraud and deceit by representing the sales load associated with the purchase of investment shares in the mall was 11 percent, a rate lower than the 15 percent in capital gains taxes the targeted investors were looking to defer under section 1031 if they invested. However, defendants allegedly structured the documents in such a way as to conceal the existence of additional costs which would be borne by plaintiff investors – characterizing those additional costs as part of the plaintiffs' "equity" in the mall. And when those additional costs were combined with the 11 percent in costs already disclosed, they brought plaintiffs' effective sales load to more than 30 percent of their total invested funds – far exceeding the potential value of any tax advantage plaintiffs hoped to achieve.

Plaintiffs acknowledge their injury from this misrepresentation occurred when they purchased their shares ("had they known the total aggregate costs to acquire [their shares] were more than 30% . . . they would not have acquired the [shares]"). But they allege they did not discover defendants' concealment – and thus their injury – until August 2012, when plaintiff Lynch contacted plaintiffs' own counsel regarding an unrelated tax issue. Further, plaintiffs allege they "could not with due diligence discover the fraud and deceit of the defendants earlier because the plaintiffs had no way of knowing and could not determine the true facts because the same were known only to defendants who held the Master Lease and were in sole and exclusive control of the Property and the accounting of the transactions described [in the second amended complaint]."

6

Respondents all demurred to the second amended complaint, asserting various deficiencies in the pleading. They all argued that each of the claims alleged against them were barred by the applicable statutes of limitations and that plaintiffs had failed to allege sufficient facts to demonstrate the delayed discovery rule would have adequately postponed accrual of the limitations periods.

The trial court sustained the demurrers without leave to amend. With respect to the statutes of limitations, the court noted "each demurrer challenged the timeliness of filing the complaint and its specific causes of action. Plaintiffs in their pleadings concede that on its face, the causes of action are barred by the statute of limitations, which therefore places the burden on plaintiffs to sufficiently plead 'delayed discovery.' [¶] The discovery rule only delays accrual until plaintiff has, or should have, inquiry notice of the [cause of action]. [¶] Plaintiffs, notwithstanding several opportunities and comments by the court, ha[ve] failed to meet the specific pleading requirements, particularly as to their 'reasonable diligence' in seeking court involvement five years after the [share] transaction was completed."

## DISCUSSION

*1. The Standard of Review*

On appeal from a judgment following the trial court's order sustaining demurrers without leave to amend, "we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory." (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." (*Blank v. Kirwin* (1985) 39 Cal.3d 311, 318.)

Appellant "bears the burden of demonstrating that the trial court erroneously sustained the demurrer as a matter of law" and "must show the complaint

7

alleges facts sufficient to establish every element of [the] cause of action." (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43.)

### 2. *The Delayed Discovery Rule*

Plaintiffs contend the statute of limitation applicable to their causes of action is three years, as all claims are grounded on allegations of fraud or mistake. (Code Civ. Proc., § 338, subd. (d).) They acknowledge the general rule is that "'"[a] cause of action accrues 'upon the occurrence of the last *element essential to the cause of action.'"'" (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 815, italics added.)

However, plaintiffs rely on the discovery rule, which "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397; *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 ["until the plaintiff has, or should have, inquiry notice of the cause of action"].) A plaintiff "has reason to discover the cause of action when he has reason at least to suspect a factual basis for its elements," meaning he has "'"'"notice or information of circumstances to put a reasonable person *on inquiry.*"'"'" *Norgart v. Upjohn Co., supra*, 21 Cal.4th at p. 398.) Once a plaintiff has inquiry notice, the limitations period commences, and "within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place – he 'cannot wait for' them 'to find' him and 'sit on' his 'rights'; he 'must go find' them himself if he can and 'file suit' if he does." (*Ibid.*, fn. omitted.)

As plaintiffs themselves acknowledge in their brief, the delayed discovery rule requires a plaintiff to plead facts showing "(1) the time and manner of discovery *and* (2) *the inability to have made earlier discovery despite reasonable diligence*." (*Fox v. Ethicon Endo-Surgery, Inc.*, *supra*, 35 Cal.4th at p. 808, italics added.) Thus, a plaintiff relying on the delayed discovery rule has the burden of alleging facts demonstrating he

would have been unable to discover the cause of action earlier despite reasonable diligence.

"The discovery rule does not encourage dilatory tactics because plaintiffs are charged with presumptive knowledge of an injury if they have ""'information of circumstances to put [them] *on inquiry*'"" or if they have ""'*the opportunity to obtain knowledge* from sources open to [their] investigation.'""" (*Fox v. Ethicon Endo-Surgery, Inc.*, *supra*, 35 Cal.4th at pp. 807-808, fn. omitted.)

*3. The Dillard's Misrepresentation*

Plaintiffs assert their claim of misrepresentation based on the Dillard's tenancy was timely for two reasons. First, they contend no cause of action even accrued based on this misrepresentation until October 2010, which is the date their promised cash flow under the terms of the mall's Master Lease was first disrupted. Until then, plaintiffs claim they suffered no "appreciable harm" as a result of Dillard's "going dark." (See *Marin Healthcare Dist. v. Sutter Health* (2002) 103 Cal.App.4th 861, 879 [statute of limitations commences only after the plaintiff sustains actual and appreciable harm].) And second, they contend that even if appreciable harm had been sustained before October 2010, they were not on notice of it until their cash flow was interrupted. We find neither claim persuasive.

First, plaintiffs' suffered their "appreciable harm" from the Dillard's misrepresentation when they purchased their shares in reliance on the information provided by defendants. The very essence of a fraud or deceit claim is that the plaintiff was induced into some act or omission – something he or she *would not otherwise have done* – in reliance on the defendant's allegedly false or misleading statement. It is the falsely induced act which is itself the injury. By expressly alleging defendants' failure to disclose that Dillard's would "go dark" was "material," plaintiffs are necessarily implying *they would not have invested in the mall if they had known that fact*. "'[A]

9

representation is considered material if it induced the consumer to alter his position to his detriment.'" (*Tucker v. Pacific Bell Mobile Services* (2012) 208 Cal.App.4th 201, 222.) Consequently, plaintiffs were harmed by the alleged Dillard's misrepresentation at the moment they handed over their money in exchange for shares in a shopping mall they would not have chosen to purchase if they had known the whole truth.

Plaintiffs' reliance on *Cleveland v. Internet Specialties West, Inc.* (2009) 171 Cal.App.4th 24 (*Cleveland*) is misplaced. In *Cleveland*, the plaintiff did not allege he was fraudulently induced into *making* an investment. Instead, his claim was that he had been falsely told the company he previously invested in went out of business, when it had instead been transformed into what later became a successful business under a different name. The court reasoned the plaintiff's cause of action did not accrue until the renamed business began returning a profit. Until then, the plaintiff had not been deprived of any financial benefit he would have shared in absent the fraud. We have no quibble with that reasoning, but it has no application here.

In this case, plaintiffs' essential claim is that they would not have purchased ownership shares in the Ashtabula Mall – at least not on the terms they did – had they known the whole truth about the Dillard's tenancy. Hence, whatever causes of action plaintiffs had arising out of that allegedly deceitful omission, accrued upon their purchase of the shares. According to their pleading, that was no later than February 2009.

Plaintiffs' alternative contention, that the statute of limitation did not commence until July 2013, when they actually "discovered" Dillard's had gone dark, likewise fails. Initially, we reject plaintiffs' assertion they had no duty to act with reasonable diligence in discovering their cause of action until they actually knew of their "injury." Plaintiffs base their assertion on the statement in *Fox v. Ethicon Endo Surgery, Inc.*, *supra*, 35 Cal.4th at p. 808, that "plaintiffs are required to conduct a reasonable investigation *after becoming aware of an injury*, and are charged with knowledge of the

10

information that would have been revealed by such an investigation." (Italics added.) Plaintiffs infer from the statement's focus on the period following discovery of the injury, no diligence would be required before that point. But *Fox* is a personal injury case, not a fraud case, and there was no contention in *Fox* the plaintiff might not have been diligent in *discovering* her injury. Thus, *Fox* cannot be read as relieving a plaintiff from any responsibility to act diligently in the management of his or her affairs even before becoming aware of an injury. "'"It is axiomatic that cases are not authority for propositions not considered."'"" (*McWilliams v. City of Long Beach* (2013) 56 Cal.4th 613, 626.)

In any event, as we have already noted, *Fox* otherwise makes clear that a plaintiff wishing to rely on the delayed discovery rule must allege facts showing not only "the time and manner of discovery" but also "*the inability to have made earlier discovery despite reasonable diligence*." (*Fox v. Ethicon Endo-Surgery, Inc.*, *supra*, 35 Cal.4th at p. 808, italics added.) Moreover, it states that plaintiffs "are charged with *presumptive knowledge of an injury* if . . . they have "'"*the opportunity to obtain knowledge* from sources open to [their] investigation.'"'" (*Id.* at pp. 807-808, some italics added, fn. omitted.)

And here, plaintiffs have failed to allege facts demonstrating that in the exercise of reasonable diligence, they would not have had the opportunity to learn that Dillard's had gone dark at the Ashtabula Mall. Plaintiffs' allegation is they "could not have known about the Dillard's misrepresentation" because "they were geographically disbursed, they relied on the representations of their fiduciaries, and could not be expected to know of local news that existed in relative obscurity at the time of investment." But that allegation merely describes why plaintiffs would not have learned about the Dillard's store closure *in the absence of diligence*: essentially, their claim is that, because they did not live in the Ashtabula area, news of the store's closure would not have reached them in the ordinary course of their lives. However, the allegation says

11

nothing about why plaintiffs, who each invested over $1 million to own a share of this particular shopping mall in Ashtabula, Ohio, could not have kept abreast of significant public events surrounding that mall in the exercise of reasonable diligence.

Nor were plaintiffs limited to asking defendants about mall business, or accepting whatever information defendants chose to disclose. With access to both telephones and the internet, plaintiffs could have easily found out about the Dillard's store closure. Consequently, they are charged with presumptive knowledge of that closure, at or around the time it occurred in December 2007. And at that point, they were on inquiry notice that defendants had engaged in misleading statements about the Dillard's tenancy.

In any event, plaintiffs themselves acknowledge they were on notice of the mall's financial difficulties. And while they claim in conclusory fashion they "reasonably believed [defendants'] ongoing representations that the [mall's] financial difficulties stemmed from the failing economy," that conclusory assertion is entitled to no credence. (*Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 410 ["Facts, not conclusions, must be pleaded"].) What plaintiffs do not allege are any facts suggesting they made a diligent effort either to confirm the truth of that representation, or to discover whether there might be other reasons for the mall's financial difficulties.

As explained in *Haley v. Santa Fe Land Imp. Co.* (1935) 5 Cal.App.2d 415, a plaintiff who is on notice that his investment is not performing as expected cannot simply wait until the evidence of fraud is undeniable before asserting a claim. In *Haley,* the court reversed a fraud judgment entered in favor of the purchaser of an orchard property who claimed the defendant had fraudulently misrepresented the condition of the soil. Although the plaintiff alleged he did not actually discover the fraud until six years after purchase, when he hired an expert to evaluate the soil, the court concluded his claim accrued when he *first noticed* a significant number of his trees were withering and dying.

12

"When plaintiff observed the continual withering and dying of his avocado trees from the spring of 1927 and thereafter, natural curiosity as well as business prudence would have compelled him to *make inquiry as to the cause thereof, and his failure to make it would be inexcusable negligence*. If he did make inquiry, then he must have discovered the cause of his trees withering and dying. He must be presumed to have known whatever with reasonable diligence he might have ascertained concerning the fraud of which he complains." (*Id.* at pp. 424-425.)

In this case, plaintiffs likewise had an obligation to pay attention to the performance of their mall investment, and to engage in reasonable inquiry at the point when they knew, or should have known, that circumstances surrounding their investment were not as portrayed by defendants in connection with the sale of plaintiffs' ownership shares. And just as in *Haley*, they are "presumed to have known whatever with reasonable diligence [they] might have ascertained concerning the fraud." (*Haley v. Santa Fe Land Imp. Co., supra,* 5 Cal.App.2d at p. 425.)

Finally, plaintiffs also allege in their second amended complaint that, even if they incurred injury when Dillard's vacated the mall, they were not on notice *of the fraud* because the mere fact Dillards vacated the premises did not establish defendants *willfully concealed their knowledge that* Dillards planned to do so. But when plaintiffs became aware that Dillards had vacated the premises – at or around the same time they purchased their investment shares – that was sufficient to prompt a reasonable person to inquire whether defendants already knew of Dillard's plan at the time they sold the shares to plaintiffs.

*4. The Sales Load Misrepresentation*

Plaintiffs' second misrepresentation claim centers on defendants' portrayal of the costs they would incur in making their investment in the shopping mall. They allege defendants represented the costs added up to 11 percent of the total investment,

13

which meant that plaintiffs would receive net equity in the property equal to 89 percent of the money they invested. However, plaintiffs allege there were other costs disguised in the transaction, which when taken together with the 11 percent disclosed, exceeded 30 percent of the invested funds.

With respect to this alleged misrepresentation, plaintiffs acknowledge their injury was the investment itself because "they would not have invested . . . if they had known that costs of investment negated their 1030 tax deferral objective." Thus, with respect to this claim of fraud and deceit, plaintiffs concede their cause of action was complete as soon as each investment transaction closed. However, they claim they did not discover defendants' fraud and deceit – and thus their injury – until August 2012, when plaintiff Lynch contacted *plaintiffs' own counsel* regarding an unrelated tax issue.

Moreover, they allege they "could not with due diligence discover the fraud and deceit of the defendants earlier because the plaintiffs had no way of knowing and could not determine the true facts because the same were known only to defendants who held the Master Lease and were in sole and exclusive control of the Property and the accounting of the transactions described [in the second amended complaint]."

The latter factual allegation is not only conclusory, but it cannot be reconciled with plaintiffs' acknowledgment that they learned of those "true facts" through a communication with *their own* counsel. If "the true facts [concerning the costs] were known only to defendants," then plaintiffs' counsel would not have known them either. Significantly, plaintiffs do not allege any facts suggesting their counsel was suddenly given access to previously secret facts in August 2012, and it was that revelation which first put plaintiffs on notice of the alleged fraud.

When taken together, the only reasonable interpretation of these allegations is that, while the facts necessary to reveal the true costs of the investment were available to plaintiffs, they either failed to pay attention to them or failed to appreciate their significance until consultation with counsel. But it is well-settled a plaintiff's inability to

14

appreciate the legal significance of the facts comprising his or her cause of action does not delay accrual of the statute of limitations. "[T]he uniform California rule is that a limitations period dependent on discovery of the cause of action begins to run no later than the time the plaintiff learns, or should have learned, the *facts* essential to his claim. [Citations.] It is irrelevant that the plaintiff is ignorant of his legal remedy or the legal theories underlying his cause of action." (*Guiterrez v. Mofid* (1985) 39 Cal.3d. 892, 897-898.)

Moreover, as defendant Baker & McKenzie points out, the private placement memorandum given to plaintiffs in connection with the solicitation of their investments provided them with the facts necessary to understand the total costs associated with their mall investment. The memorandum incorporated a chart outlining the "Estimated Use of Funds" invested in the mall shares. It disclosed that of the 89 percent of the investors' money considered "Available for Investment" – referring to the amount left after deducting an initial 11 percent for costs and commissions associated with the investment offering – an additional 22 percent would be spent on "Mortgage Loan Fees and Costs" (5.26 percent), "Acquisition Fee" (8.61 percent) and "Closing and Carrying Costs" (7.66 percent). The chart also disclosed that only 67.47 percent of the invested funds would be used for "Down Payment for Purchase of Property."

Although plaintiffs' contend this chart did not "clearly disclose[]" their aggregate costs, and note it was not identified as "an accounting of [their] costs," that contention is not sufficient to stave off the statute of limitations. Even assuming the disclosure was not crystal clear, it was that very *lack of clarity* which should have prompted a reasonably diligent investor to inquire about a perceived discrepancy between the chart's representation that *89 percent* of the invested funds would be "Available for Investment," and its representation that only *67 percent* of the funds would actually be paid toward purchase of the property. A reasonably diligent investor would have inquired about the missing 22 percent and had the matter clarified. Because the facts

15

necessary to an understanding of the total cost of the mall investment were at all times available to plaintiffs, they are not entitled to rely on the delayed discovery rule to toll the applicable statute of limitations.

Finally, plaintiffs' allegation they "held no suspicion as to a possible fraud because they received the described tenant in common interest in the property, the represented percentage cash flow therefrom and ostensibly were able to report a deferral of the capital gains taxes" changes nothing. Nor does plaintiffs' allegation they "had no cause to review the bona fides of the 1031 deferred capital gains until the Property was to be foreclosed upon *and* plaintiffs were about to receive a tax reporting for a discharge of indebtedness for the tax year of the foreclosure." Plaintiffs' claim of misrepresentation pertaining to the costs of the investment is unrelated to their apparent satisfaction with other aspects of the investment. Moreover, plaintiffs do not allege any injury relating to the *bona fides* of the section 1031 deferred capital gains. Specifically, they do not allege they were denied the tax deferral they sought as part of their investment. Instead, their allegation is they were misled as to the total cost of the investment, which *exceeded* the value of the deferred tax benefit they apparently did receive. As we have already explained, plaintiffs were at least on inquiry notice of those costs at the time they invested. Consequently, the statute of limitations applicable to any cause of action arising out of that misrepresentation began running at that point.

*5. Leave to Amend*

Plaintiffs do not argue the trial court abused its discretion in denying them leave to amend their second amended complaint. Nor do they offer any suggestion as to how their complaint might be amended to cure its defects. As they bear the burden on that issue, we need not consider it further. (*Maxton v. Western States Metals* (2012) 203 Cal.App.4th 81, 95 [A plaintiff seeking to amend ""“must show in what manner he can

16

amend his complaint and how that amendment will change the legal effect of his pleading"'"'].)

DISPOSITION

The judgment is affirmed. Respondents are entitled to their costs on appeal.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

MOORE, J.

THOMPSON, J.